# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| ULTRAVISION TECHNOLOGIES, LLC, | § § § | |
| *Plaintiff*, | § § | Case No. 2:18-cv-00100-JRG-RSP |
| v. | § § | LEAD CASE |
| GOVISION LLC, | § § | |
| *Defendant*. | § § | |

## MEMORANDUM ORDER

Before the Court is Defendants Shenzhen Absen Optoelectronic Co., Ltd.'s and Absen, Inc.'s ("Absen") Motion to Exclude the Testimony of Plaintiff's Expert Stephen E. Dell ("Motion"). **Dkt. No. 432**. Absen's Motion asks the Court to exclude Mr. Dell's damages opinion that an 8% royalty rate is reasonable.

### I.  BACKGROUND

On March 27, 2018, Ultravision filed its original complaint against Absen asserting several patents including U.S. Patent No. 9,916,782 (the "'782 Patent"). *Ultravision Technologies, LLC v. Shenzhen Absen Optoelectronic Co., Ltd. et al*, Case No. 2:18-cv-00112-JRG-RSP ("Absen Member Case"), Dkt. No. 1. On April 12, 2019, the Court consolidated the Absen Member Case along with several other member cases under the lead case against GoVision, LLC. Dkt. No. 17.

On June 6, 2019, Ultravision filed its First Amended Complaint asserting several more patents including U.S. Patent No. 9,990,869 (the "'869 Patent"), U.S. Patent No. 9,978,294 (the "'294 Patent"), and U.S. Patent No. 9,207,904 (the "'904 Patent"). Following this First Amended Complaint, the case has narrowed significantly. Every defendant in the above-captioned matter has settled except for Absen, and the only remaining patents asserted against Absen are the '782

1

Patent, the '869 Patent, the '294 Patent, and the '904 Patent (collectively, the "Asserted Patents"). Dkt. No. 615 at 1–3.

On May 11, 2021, in correspondence with the Court, counsel represented to the Court that Ultravision and Absen agree that § IV(B) of the present Motion is moot. Accordingly, the only remaining dispute regards Mr. Dell's 8% royalty opinion for the Asserted Patents and Mr. Dell's reliance on a Settlement and License Agreement between Ultravision and Light Technologies, Inc. ("LTI") (the "LTI License"). *Id.* at 4, 7–8, 10–11.

## II. LEGAL STANDARDS

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). District courts are accorded broad discretion in making Rule 702 determinations of admissibility. *Kumho Tire*, 526 U.S. at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the district court may consider in determining whether an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be

helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) ("'[t]he trial court's role as gatekeeper [under Daubert] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits," quoting Fed. R. Evid. 702 advisory committee note). As the Supreme Court explained in *Daubert*, 509 U.S. at 596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

Upon a finding of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . ." 35 U.S.C. § 284. "A 'reasonable royalty' derives from a hypothetical negotiation between the patentee and the infringer when the infringement began." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868–69 (Fed. Cir. 2010) (citation omitted). A comprehensive

(but unprioritized and often overlapping) list of relevant factors for a reasonable royalty calculation appears in *Georgia–Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

III. **ANALYSIS**

Absen contends that Mr. Dell has not performed the requisite analysis to show a link between the LTI License and the Asserted Patents. Dkt. No. 432 at 10. Absen asserts that Mr. Dell lumps together Ultravision agreements with three separate companies: Lamar, LTI, and Irving, which he refers to simply as the "Ultravision/Lamar" agreements. *Id.* Absen argues that the 8% royalty rate is only present in the LTI License, which Absen claims provided LTI with a license to patents related to LEDs in billboard lights but specifically excluded all the patents at issue in this litigation. *Id.*

Absen further argues that Mr. Dell does not rely on any opinion from Ultravision's technical expert that the technologies and products licensed under the LTI License are comparable to those that would be licensed in the hypothetical negotiation between Ultravision and Absen. *Id.* at 11. Absen asserts that Mr. Dell attempts to overcome this by baselessly grouping the LTI License with the Lamar agreements and Irvin agreement. Absen contends even if billboard lights are the "same as, or similar to, the Accused Products in this case," Mr. Dell has not performed analysis to determine how an 8% royalty rate on billboard lights is appropriate to use for LED digital display technology. *Id.* (quoting Dkt. No. 432-8 at ¶ 142).

Ultravision responds that it did not rely on the LTI License for its 8% royalty rate but rather a settlement agreement with RMG Networks Holding Co., which includes the Asserted Patents. Dkt. No. 494 at 4. Ultravision asserts Absen used "misleading grammatical tactics" and fills out a selective quotation from Absen's Motion. *Id.* at 6. In Absen's Motion, Absen quote's Mr. Dell's report as:

4

> "[I]t is my opinion that the … 8% royalty rate[] identified in the Ultravision/Lamar … agreements above are highly relevant reasonable royalty rate benchmarks or indicators that would assist in informing the outcome of the hypothetical negotiation between Ultravision and Defendant for license rights to the patents at issue.

*Id.* (quoting Dkt. No. 432 at 7 (quoting Dkt. No. 432-8 at ¶ 151). As Ultravision notes in their response, the entirety of the paragraphs provides:

> **Therefore, while the Ultravision agreements discussed above do not provide evidence of an established royalty for the patents at issue, i**t is my opinion that the 6% to 8% royalty rate**s** identified in the Ultravision/Lamar **and Ultravision/RMG** agreements above are highly relevant reasonable royalty rate benchmarks or indicators that would assist in informing the outcome of the hypothetical negotiation between Ultravision and Defendant for license rights to the patents at issue. **Additionally, it is my opinion that these agreements would also provide the parties with direct evidence of the licensing structure and form of royalty payment that would be considered as part of the hypothetical negotiation.**

Dkt. No. 494 at 6 (quoting Dkt. No. 432-8 at ¶ 151) (emphasis added).

Ultravision asserts Mr. Dell's analysis started at the 6% royalty rate in the RMG license and Lamar digital display patent license, not the LTI License that is the subject of Absen's Motion. Dkt. No. 494 at 7 (citing Dkt. No. 432-8 at ¶ 142). Ultravision contends Mr. Dell adjusted this royalty rate upwards using Georgia-Pacific Factors 5 and 6,[1] concluding that a reasonable royalty is 8%,[2] and then "[a]s further confirmation that the 8% royalty in this case is correct, Mr. Dell looked to the licensing policies and practice of Ultravision . . . to confirm that, based on Ultravision's past licensing history, 8% is a royalty rate that would be acceptable to Ultravision." Dkt. No. 494 at 7 (citing Dkt. No. 432-8 at ¶ 251).

Ultravision argues Mr. Dell used the judicially accepted hypothetical negotiation methodology within the framework of the *Georgia-Pacific* factors. Dkt. No. 494 at 8. Ultravision

---
[1] Citing Dkt. No. 432-8 at ¶¶ 164, 168
[2] Citing Dkt. No. 432-8 at ¶¶ 259–60

concludes, "Absen's Motion stems from a misreading and misinterpretation (or worse, mischaracterization) of his analysis, and unsupported attorney argument pointing out perceived weaknesses in the damages assessment. This does not provide grounds for exclusion under Daubert." *Id.* (citing *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012)).

Absen replies, "Ultravision [] makes no effort to link the technology licensed in the LTI License to the patents asserted here, but rather concedes that the LTI License covered a different patent portfolio than is at issue here." Dkt. No. 523 at 5 (citing Dkt. No. 494 at 4, 6). Absen argues Mr. Dell relies upon both the RMG license and the LTI License "as comparable benchmark licenses to be the starting points," quoting Mr. Dell's report where, for example, Mr. Dell called both licenses "highly relevant reasonable royalty rate benchmarks" and "consider[s] the royalty rates paid by the respective parties in the above agreements, ranging from 6% to 8% . . . ." *Id.* at 5–6(quoting Dkt. No. 432-8 at ¶ 151, 241, 243, 256, 260).

Absen contends Mr. Dell did not use the 6% rate as his starting point, but rather a 6–8% range. *Id.* at 6. Absen remarks Ultravision acknowledges in its response that Mr. Dell does not just use the RMG license but also relies on the "Ultravision-Lamar digital display patent license" as a starting point. *Id.* at 6–7 (citing Dkt. No. 494 at 7 (citing Dkt. No. 432-8 at ¶ 131)). Absen argues the Ultravision-Lamar license to display patents was for a lump sum, not an 8% royalty, and asserts this confirms Absen's point: "Mr. Dell lumped together the LTI License with other licenses to different technology and collectively calls them the 'Ultravision/Lamar' agreements, but the 8% rate only comes from the non-comparable LTI License." *Id.* at 7 (citing Dkt. No. 432-8 at ¶ 110–12). Absen concludes Mr. Dell's 8% royalty opinion necessarily depends on the non-comparable LTI License and must be excluded. *Id.*

Ultravision counters that Mr. Dell considered the LTI License as relevant to LED technology generally and as evidence of Ultravision's "licensing policies as practices, its willingness to license certain of its patent portfolios, its preference for royalty or lump sum licenses, and ranges of royalty rates that it would accept." Dkt. No. 549 at 4–5. Ultravision asserts again Mr. Dell's starting point was the 6% royalty in the RMG license.

Ultravision correctly points out that the LTI License is used as evidence of Ultravision's licensing practices as a whole. Mr. Dell says, "it is my opinion that the 6% to 8% royalty rates identified in the Ultravision/Lamar and Ultravision/RMG agreements above are highly relevant," and there is no clear indication that Mr. Dell begins scaling from 8% instead of 6%. *See* Dkt. No. 432-8 at ¶ 151. If Mr. Dell began scaling at 8%, then Mr. Dell would necessarily end with a royalty higher than 8% after scaling it upwards in response to *Georgia-Pacific* factors 5 and 6. *See Id.* at ¶ 164, 168, 259–60.

Further, the Court finds that use of the LTI License as evidence of Ultravision's general licensing practices is relevant and probative. Even without the consideration of this evidence of Ultravision's general licensing practices, it is not unreasonable nor outside of the bounds of acceptable methodology for Mr. Dell to begin at 6% and, by scaling upwards twice, arrive at 8%. The credibility of such scaling is a matter of fact to be determined by the jury. Accordingly, Defendants have shown no basis to strike references to the licenses at issue.

### IV. CONCLUSION

Accordingly, Absen's Motion (Dkt. No. 432) is DENIED.

**SIGNED this 25th day of May, 2021.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE